[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14024
Non-Argument Calendar
_____

D.C. Docket No. 2:14-cv-00211-CSC

LINDSAY ACRE,
ROBERT MORRIS,
as personal Representative of the Estate of Jeremy Allen Acre,

Plaintiffs-Appellants,

versus

JASON CHAMBERS,
in his individual capacity, Deputy Sheriff of Elmore County, Alabama,
AL COX,
in his individual capacity, Deputy Sheriff of Elmore County, Alabama,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(April 18, 2016)

Before ED CARNES, Chief Judge, WILSON and ROSENBAUM, Circuit Judges.

PER CURIAM:

Lindsay Acre and Robert Morris appeal the district court's grant of summary judgment, on qualified immunity grounds, in favor of deputy sheriffs Jason Chambers and Al Cox.  Because neither Chambers nor Cox violated clearly established law, we affirm the district court's judgment.

Sometime on March 19, 2013, Chambers received a call from Chris Zeigler, a lieutenant with the Elmore County Sheriff's Department.  Zeigler, who was off-duty at the time, explained that he had received a call from Amy Shumate, who said that she had just left the home of Jeremy Acre and his wife, Lindsay, and that the Acres "were potentially involved in a physical altercation at that time."  Zeigler then relayed to Chambers that, about two weeks earlier, "he had completed an incident/offense report involving Jeremy and Lindsay Acre where Jeremy had allegedly strangled his wife and bound her with duct tape and . . . threatened her with some type of weapon, I believe a handgun," but that Lindsay had "refused to pursue criminal prosecution against [Jeremy]" at that time.  Zeigler said that he had been to the Acres' home on an earlier occasion to speak with Jeremy; that "this problem between the Acres had been going on for a couple of weeks"; that there was "a history of violence there, being domestic violence"; and that "Mr. Acre did own a weapon also that was . . . allegedly used."

2

Zeigler asked Chambers to conduct a welfare check on the Acres. A welfare check is a routine police practice where officers "check on someone's well-being." Because Jeremy was "hostile or very temperamental," Zeigler instructed Chambers to "take somebody with [him]" when he checked on the Acres and "to use extreme caution" around Jeremy. After the call from Zeigler, Chambers phoned Cox and briefed him about what Zeigler had said. In particular, Chambers told Cox that Jeremy "had been known to have a weapon," so that they should "use extreme caution" during the visit.

At around 10:54 p.m., the defendants arrived at the Acres' home, which was dark. They approached the front door, listened there, and, hearing nothing, knocked. When no one responded to their first knock, they knocked again.

The parties dispute exactly what happened next. We resolve that dispute by adopting Lindsay's account of events — at least where it materially differs from the defendants' — since it was the deputies who prevailed at summary judgment. See Tolan v. Cotton, 572 U.S. —, 134 S. Ct. 1861, 1866 (2014). Lindsay heard the deputies knock and told Jeremy that she thought someone was at the door. Jeremy grabbed his gun and went to check. Just before he opened the door, the deputies heard a semi-automatic firearm being chambered with a round of ammunition. Chambers turned to Cox and said, "hey, that's a gun," then drew his own firearm and held it by his side. Jeremy opened the door in a manner Lindsay described as

3

"more forceful[] than normal."  When he saw the deputies, who were in uniform and clearly recognizable as law enforcement officers, he looked at Lindsay with what Chambers describes as "this enraged look on his face," and said, "Really?" Lindsay insisted to him that she had not called the sheriff.  Chambers says she "cowered down to [Jeremy]" when she told him that.  Jeremy never asked or expressed any uncertainty about why the deputies were there.

The deputies noticed that Jeremy, who was "obviously angry" and "agitated," was holding a gun, and Chambers, "fear[ing] for [his own] safety as well as [his] partner's safety," told Jeremy to put it down.  Jeremy refused, insisting that "it was his home and he had every right to hold his gun."  After repeatedly instructing Jeremy to put his gun down, Chambers pointed his gun at Jeremy and ordered him to put it down.  Jeremy continued to refuse, his voice becoming louder and louder.  Eventually, Cox told Chambers "that he was going to tase [Jeremy]," at which point Jeremy tried to shut the door on the deputies. Chambers, however, managed to put his foot in the door before Jeremy could shut it.  He then pushed the door open to "make sure that [Jeremy] wasn't fixing to try to shoot me through the door or cause harm to [Lindsay]."  A few seconds after the deputies entered the Acres' home,[1] Jeremy "aggressively . . . rush[ed]" them,

---

[1] What happened in those few seconds is disputed.  The deputies say they tased Jeremy and he briefly fell to the floor, then got up.  The plaintiffs argue that data from the taser shows it was not fired until about nine minutes after the deputies reported that shots had been fired.  That

"raising [his] weapon in a threatening manner" that led Chambers to believe Jeremy was "fixing to, you know, shoot [him] or Deputy Cox or both." Sensing "that [his] life as well as [his] partner's life was in danger," Chambers fired his weapon, killing Jeremy before he could reach either deputy. Lindsay and Morris, the representative of Jeremy's estate, brought § 1983 claims against Chambers and Cox, alleging two Fourth Amendment violations: (1) unlawfully entering the Acres' home; and (2) using excessive force against Jeremy. The district court granted summary judgment to the deputies on the ground that qualified immunity shielded them from the plaintiffs' claims.

It is undisputed that Chambers and Cox were acting within their discretionary authority at all times relevant to this case, and they are therefore entitled to qualified immunity unless their conduct violated clearly established law. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). The "dispositive inquiry" for purposes of deciding whether official conduct violated clearly established law "is whether it would have been clear to a reasonable officer in the [deputies'] position that their conduct was unlawful in the situation they confronted." Wood v. Moss, 572 U.S. —, 134 S. Ct. 2056, 2067 (2014) (alterations and quotation marks omitted).

---

sequence of events is immaterial to the outcome here because the plaintiffs' excessive force claims are predicated on the deputies' use of deadly force against Jeremy, not their use of the taser.

The deputies did not violate clearly established law when they entered the Acres' home because the law allows law enforcement personnel to enter a home without a warrant when exigent circumstances call for it. See Brigham City v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 1948 (2006). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured *or threatened with such injury*." Id. (emphasis added). Under the circumstances and based on Zeigler's report to them, the deputies reasonably concluded that there was an imminent threat of domestic violence. As the Supreme Court has explained, "so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police" could not enter a home "to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur." Georgia v. Randolph, 547 U.S. 103, 118, 126 S. Ct. 1515, 1525 (2006).

That is exactly what the deputies did here. They had a report that Jeremy was "possibly engaged in a domestic violence type of situation" with Lindsay and that he had violently attacked her in the past. When they encountered Jeremy on the night of the shooting, he was visibly "enraged," refused to put down his loaded gun despite the deputies' repeated commands that he do so, and accused Lindsay of calling the cops. They saw Lindsay cowering and heard her insist to Jeremy that she hadn't called anyone. And so, when Jeremy tried to lock himself in his home

6

with Lindsay, the deputies reasonably feared for Lindsay's safety (as well as their own).  Based on those circumstances, viewed in their totality, a reasonable officer in the deputies' position could have believed that violence was imminent, so that exigent circumstances warranted the deputies' entering the Acres' home to protect Lindsay (and themselves) from Jeremy.

The plaintiffs also contend that the use of deadly force against Jeremy violated his Fourth Amendment rights.  We have explained that "[a]ny use of force must be reasonable," and that "[r]easonableness is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including . . . whether the suspect poses an immediate danger to the officer or others . . . and the feasibility of providing a warning before employing deadly force." Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010).  The use of deadly force "is judged objectively, and [the deputies are] shielded from liability unless application of that standard would inevitably lead every reasonable officer in [their] position to conclude the force was unlawful." Id. (alterations and quotation marks omitted).

The officers had a reasonable belief that there was an imminent threat of domestic violence when they entered the Acres' home.  Jeremy had refused to put down his firearm after repeated instructions to do so, and he continued to refuse to put it down even after Chambers pointed his service weapon at him and ordered

7

him to do so.  After the deputies entered the home, Jeremy came toward them threateningly with a loaded firearm in his hand, and only at that point did Deputy Chambers discharge his firearm.  Under those circumstances, our binding precedent dictates that the use of deadly force did not violate clearly established law.  See, e.g., id. at 821–22; Garczynski v. Bradshaw, 573 F.3d 1158, 1168 (11th Cir. 2009); Robinson v. Arrugueta, 415 F.3d 1252, 1256 (11th Cir. 2005); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249 (11th Cir. 2004); Carr v. Tatangelo, 338 F.3d 1259, 1269 (11th Cir. 2003); Montoute v. Carr, 114 F.3d 181, 185 (11th Cir. 1997).

**AFFIRMED.**