Justice THOMAS, dissenting.
When we granted certiorari in this case, we directed the parties to address, in addition to the questions presented by petitioners, "[w]hether the claim in this case may be asserted under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)." 580 U.S. ----, 137 S.Ct. 291, 196 L.Ed.2d 211 (2016). I would answer that question, rather than remand for the Court of Appeals to do so. I continue to adhere to the view that "Bivens and its progeny" should be limited "to the precise circumstances that they involved." Ziglar v. Abbasi, --- U.S., at ----, 137 S.Ct., at 1870 (THOMAS, J., concurring in part and concurring in judgment) (internal quotation marks omitted). This case arises in circumstances that are meaningfully different from those at issue in Bivens and its progeny. Most notably, this case involves cross-border conduct, and those cases did not. I would decline to extend Bivens and would affirm the judgment of the Court of Appeals on that basis.
Justice BREYER, with whom Justice GINSBURG joins, dissenting.
The parents of Sergio Adrián Hernández Güereca brought this constitutional tort action against a United States Border Patrol agent, Jesus Mesa, Jr. They claim that Mesa violated their son's constitutional rights when Mesa shot and killed him on June 7, 2010. Hernández and some of his friends had been running back and forth across a Rio Grande River culvert that straddles the border between the United States and Mexico. When Mesa shot him, Hernández had returned to, and was on, the Mexican side of the culvert.
The Court of Appeals, affirming the District Court, held (among other things) that Hernández had no Fourth Amendment rights because he was not a citizen of the United States, he was "on Mexican soil at the time he was shot," and he "had no 'significant voluntary connection' to the United States." Hernandez v. United States, 785 F.3d 117, 119 (2015) (per curiam ) (quoting United States v. Verdugo-Urquidez, 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) ). I would reverse the Court of Appeals' Fourth Amendment holding. And, in my view, that reversal would ordinarily bring with it the right to bring an action for damages under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). See Wood v. Moss, 572 U.S. ----, ----, 134 S.Ct. 2056, 2066, 188 L.Ed.2d 1039 (2014) (Bivens actions lie for Fourth Amendment violations); Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (officer's application of lethal force when there is no immediate threat to self or others violates the Fourth Amendment). See also Ziglar v. Abbasi, --- U.S., at ----, 137 S.Ct., at 1881 - 1882 (BREYER, J., dissenting).
I recognize that Hernández was on the Mexican side of the culvert when he was shot. But, we have written in a case involving the suspension of habeas corpus that "de jure sovereignty" is not and never has been "the only relevant consideration in determining the geographic reach of the Constitution." Boumediene v. Bush, 553 U.S. 723, 764, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). We have added that our precedents *2009 make clear that "questions of extraterritoriality turn on objective factors and practical concerns, not formalism." Ibid. ; see also id., at 759-762, 128 S.Ct. 2229. Those factors and concerns here convince me that Hernández was protected by the Fourth Amendment.
First, the defendant is a federal officer. He knowingly shot from United States territory into the culvert. He did not know at the time whether he was shooting at a citizen of the United States or Mexico, nor has he asserted that he knew on which side of the boundary line the bullet would land.
Second, the culvert itself has special border-related physical features. It does not itself contain any physical features of a border. Rather, fences and border crossing posts are not in the culvert itself but lie on either side. Those of Mexico are on the southern side of the culvert; those of the United States are on the northern side. The culvert (where the shooting took place) lies between the two fences, and consists of a concrete-lined empty space that is typically 270 feet wide.
Third, history makes clear that nontechnically speaking, the culvert is the border; and more technically speaking, it is at the least a special border-related area (sometimes known as a "limitrophe" area, see infra, at 2010). Originally, the 1848 Treaty of Guadalupe Hidalgo provided that the boundary should run "up the middle" of the Rio Grande River "following the deepest channel." See Art. V, July 4, 1848, 9 Stat. 926. It also provided that "navigation ... shall be free ... to the vessels and citizens of both countries." Art. VII, id., at 928. Subsequently the river jumped its banks, setting a new course, and provoking serious disputes about the border's location. See S. Liss, A Century of Disagreement: The Chamizal Conflict 1864-1964, p. 15 (1965) (the river's "ravages ... irreparably destroyed any semblance of a discernable United States boundary line in the Ciudad Juarez-El Paso area"). In the 1960's, however, the United States and Mexico negotiated a new boundary. The two nations working together would "relocat[e]" the river channel. Convention for the Solution of the Problem of the Chamizal, Art. 2, Aug. 29, 1963, 15 U.S.T. 23, T.I.A.S. No. 5515 (Chamizal Convention). They would jointly bear the costs of doing so; and they would charge a bilateral commission with "relocation of the river channel ... and the maintenance, preservation and improvement of the new channel." Art. 9, id., at 26. When final construction of the new channel concluded, President Johnson visited the site to celebrate the "channels between men, bridges between cultures" created by the countries' joint effort. Kramer, A Border Crosses, The New Yorker, Sept. 20, 2014, online at http://www.newyorker.com/news/news-desk/moving-mexican-border (all internet materials as last visited June 23, 2017); see also Appendix, fig. 2, infra (photograph of President and Mrs. Johnson touring the culvert). That "channel" is the culvert now before us.
Fourth, a jointly organized international boundary commission built, and now administers, the culvert. Once created, the Commission arranged for surveys, acquired rights of way, and built and paved the massive culvert structure. See Appendix, fig. 1, infra (typical cross-section of the proposed concrete "culvert"); see also International Boundary and Water Commission, United States and Mexico, Preliminary Plan (July 25, 1963), Annex to Chamizal Convention, 15 U.S. T., following p. 36. The United States contributed approximately $45 million of the total cost. See Compliance With Convention on the Chamizal, S.Rep. No. 868, 88th Cong., 2d Sess., 2 (1963); Act To Facilitate Compliance With the Convention Between United States and United Mexican States, § 8, 78 *2010 Stat. 186. The United States and Mexico have jointly agreed to maintain the Rio Grande and jointly to maintain the "limitrophe" areas. Treaty To Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary, Art. IV, Nov. 23, 1970, 23 U.S.T. 390, T.I.A.S. No. 7313 (Rio Grande and Colorado River Treaty). Today an International Boundary and Water Commission, with representatives of both nations, exercises its "jurisdiction" over "limitrophe parts of the Rio Grande." Treaty of Feb. 3, 1944, Art. 2, 59 Stat. 1224.
Fifth, international law recognizes special duties and obligations that nations may have in respect to "limitrophe" areas. Traditionally, boundaries consisted of rivers, mountain ranges, and other areas that themselves had depth as well as length. Lord Curzon of Kedleston, Frontiers 12-13 (2d ed. 1908). It was not until the late 19th century that effective national boundaries came to consist of an engineer's "imaginary line," perhaps thousands of miles long, but having "no width." Reeves, International Boundaries, 38 Am. J. Int'l L. 533, 544 (1944); see also 1 Oppenheim's International Law 661, n. 1 (R. Jennings & A. Watts eds., 9th ed. 1992). Modern precision may help avoid conflicts among nations, see, e.g., Rio Grande and Colorado River Treaty, preamble, 23 U.S. T., at 373, but it has also produced boundary areas-of the sort we have described-which are " 'subject to a special legal, political and economic regime of internal and international law,' " Andrassy, Les Relations Internationales de Voisinage, in The Hague Academy of Int'l Law, 1951 Recuiel des Cours 131 (quoting Paul de Lapradelle, La Frontiere 14 (1928)). Those areas are subject to a special obligation of co-operation and good neighborliness, V. Lowe, International Law 151 (2007) (describing the "regime of voisinage, " which includes "jointly administered infrastructure facilities ... co-operation between neighboring police forces ... bilingual road signs, ... shared access to common resources," and the like); cf. United Nations Convention on the Law of the Sea, Art. 111(8), Dec. 10, 1982, 1833 U.N.T.S. 396 (requiring compensation for loss arising from the erroneous exercise of a sovereign's right of hot pursuit), as well as express duties of joint administration that adjoining states undertake by treaty.
Sixth, not to apply the Fourth Amendment to the culvert would produce serious anomalies. Cf. Verdugo-Urquidez, 494 U.S., at 278, 110 S.Ct. 1056 (KENNEDY, J., concurring). The Court of Appeals' approach creates a protective difference depending upon whether Hernández had been hit just before or just after he crossed an imaginary mathematical borderline running through the culvert's middle. But nothing else would have changed. The behavior of the United States Border Patrol agent, along with every other relevant feature of this case, would have remained the same. Given the near irrelevance of that midculvert line (as compared with the rest of the culvert) for most border-related purposes, as well as almost any other purpose, that result would seem anomalous.
Moreover, the anomalies would multiply. Numerous bridges span the culvert, linking El Paso and Ciudad Juarez. See Chamizal Convention, Arts. 8-10, 15 U.S. T., at 25-26. "Across this boundary thousands of Americans and Mexicans pass daily, as casually as one living inland crosses a county line." Liss, supra, at 4; Semuels, Crossing the Mexican-American Border, Every Day, The Atlantic, Jan. 25, 2016, online at https://www.theatlantic.com/business/archive/2016/01/crossing-the-mexican-american-border-every-day/426678/; Brief for Border Scholars as Amici Curiae 21-22 (Fifty-five percent of households in the sister cities cross the *2011 border to comparison shop for everyday goods and Mexican shoppers spend $445 million each year in El Paso businesses). It does not make much sense to distinguish for Fourth Amendment purposes among these many thousands of individuals on the basis of an invisible line of which none of them is aware.
These six sets of considerations taken together provide more than enough reason for treating the entire culvert as having sufficient involvement with, and connection to, the United States to subject the culvert to Fourth Amendment protections. I would consequently conclude that the Fourth Amendment applies.
Finally, I note that neither court below reached the question whether Bivens applies to this case, likely because Mesa did not move to dismiss on that basis. I would decide the Fourth Amendment question before us and remand the case for consideration of the Bivens and qualified immunity questions. See Ziglar v. Abbasi, --- U.S., at ----, 137 S.Ct., at 1872 - 1873 ; but see - -- U.S., at ----, 137 S.Ct., at 1883 - 1885 (BREYER, J., dissenting).
For these reasons, with respect, I dissent.
APPENDIX
?
Figure 1. International Boundary and Water Commission, United States and Mexico, Relocation of Rio Grande, El Paso, Texas-Ciudad Juarez, Chihuahua, Preliminary Plan (July 25, 1963), Annex to Chamizal Convention, 15 U.S. T., following p. 36, T.I.A.S. No. 5515.
?
*2012 Figure 2. President Lyndon Johnson and Mrs. Lady Bird Johnson view the new channel. Associated Press, Dec. 13, 1968.