PER CURIAM:
We rehear this matter en banc, see Hernandez v. United States, 771 F.3d 818 (5th Cir.2014) (per curiam) (on petitions for rehearing en banc), to resolve whether, under facts unique to this or any other circuit, the individual defendants in these consolidated appeals are entitled to qualified immunity. Unanimously concluding that the plaintiffs fail to allege a violation of the Fourth Amendment, and that the Fifth Amendment right asserted by the plaintiffs was not clearly established at the time of the complained-of incident, we affirm the judgment of dismissal.
The facts and course of proceedings are accurately set forth in the panel majority opinion of Judge Prado, Hernandez v. United States, 757 F.3d 249, 255-57 (5th Cir.2014). We conclude that the panel opinion rightly affirms the dismissal of Hernandez’s claims against the United States, id. at 257-59, and against Agent Mesa’s supervisors, id. at 280, and we therefore REINSTATE Parts I, II, and VI of that opinion. We additionally hold that pursuant to United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), Hernandez, a Mexican citizen who had no “significant voluntary connection” to the United States, id. at 271, and who was on Mexican soil at the time he was shot, cannot assert a claim under the Fourth Amendment.
The remaining issue for the en banc court is properly described as whether *120 “the Fifth Amendment ... protects] a non-citizen with no connections to the United States who suffered an injury in Mexico where the United States has no formal control or de facto sovereignty.” Id. at 281-82 (DeMoss, J., concurring in part and dissenting in part). To underscore the seriousness of the tragic incident under review, we elaborate on that description only to note that the injury was the death of a teenaged Mexican national from a gunshot fired by a Border Patrol agent standing on U.S. soil.
To decide the assertion of qualified immunity made by defendant Agent Mesa, regarding the plaintiffs’ Fifth Amendment claim, the court avails itself of the latitude afforded by Pearson v. Callahan: “The judges of the ... courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.” 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (overruling Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).
The prongs referred to are famil- . iar: “First, a court must decide whether the facts ... alleged ... make out a violation of a constitutional right.... Second, if [so], the court must decide whether the right at issue was ‘clearly established’ at the time of [the] alleged misconduct.” Id. at 232,129 S.Ct. 808. “Qualified immunity is applicable unless [both prongs are satisfied].” Id.
The panel opinion correctly describes the substantive-due-process claim as “that Agent Mesa showed callous disregard for Hernandez’s Fifth Amendment rights by. using excessive, deadly force when Hernandez was unarmed and presented no threat.” Hernandez, 757 F.3d at 267. The question is whether, under the unique facts and circumstances presented here, that right was “clearly established.”
The Supreme Court has carefully admonished that we are “not to define clearly established law at a high level of generality.” Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011). To the contrary, a right is clearly established only where “it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam) (quoting Saucier, 533 U.S. at 202, 121 S.Ct. 2151) (internal quotation marks omitted). The question here is whether the general prohibition of excessive force applies where the person injured by a U.S. official standing on U.S. soil is an alien who had no significant voluntary connection to, and was not in, the United States when the incident occurred. No case law in 2010, when this episode occurred, reasonably warned Agent Mesa that his conduct violated the Fifth Amendment.
Although the en banc court is somewhat divided on the question of whether Agent Mesa’s conduct violated the Fifth Amendment, the court, with the benefit of further consideration and en banc supplemental briefing and oral argument, is unanimous in concluding that any properly asserted right was not clearly established to the extent the law requires. The strongest authority for the plaintiffs may be Boumediene v. Bush, which addressed whether the Suspension Clause of the U.S. Constitution applied to aliens detained outside the United States at the U.S. Naval Base in Guantanamo Bay, Cuba. 553 U.S. 723, 732-33,128 S.Ct. 2229,171 L.Ed.2d 41 (2008). Although the Court drew on cases from contexts other than habeas corpus, see id. at 755-64, 128 S.Ct. 2229 (discuss *121 ing the Court’s precedents on “the Constitution’s extraterritorial application,” including, inter alia, the Insular Cases, In re Ross, 140 U.S. 453, S.Ct. 897, 35 L.Ed. 581 (1891), Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), and Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056), it expressly limited its holding to the facts before it, see id. at 795, 128 S.Ct. 2229 (“Our decision today holds only that petitioners before us are entitled to seek the writ; that the [Detainee Treatment Act] review procedures are an inadequate substitute for habeas corpus; and that petitioners in these cases need not exhaust the review procedures in the Court of Appeals before proceeding with their habeas actions in the District Court.”). Accordingly, nothing in that opinion presages, with the directness that the “clearly established” standard requires, whether the Court would extend the territorial reach of a different constitutional provision — the Fifth Amendment— and would do so where the injury occurs not on land long controlled by the United States, but on soil that is indisputably foreign and beyond the United States’ territorial sovereignty. By deciding this case on a ground on which the court is in consensus, we bypass that issue by giving allegiance to “the general rule of constitutional avoidance.” Callahan, 555 U.S. at 241, 129 S.Ct. 808.
“There are cases in. which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.” Id. at 237, 129 S.Ct. 808. Reasonable minds can differ on whether Boumediene may someday be explicitly extended as the plaintiffs urge. That is the chore of the first prong of the qualified-immunity test, which we do not address.
The alleged right at issue was not clearly established, under these facts, in 2010.
The judgment of dismissal is AFFIRMED.
EDITH H. JONES, Circuit Judge, joined by SMITH, CLEMENT, and OWEN, Circuit Judges, concurring:
The court has unfortunately taken the path of least resistance. We hold unanimously that Agent Mesa has qualified immunity from this suit for a Fifth Amendment substantive due process violation because he did not violate any clearly established rights flowing from that Amendment. Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009). This compromise simply delays the day of reckoning until another appellate panel revisits non-citizen tort claims for excessive force resting on extraterritorial application of the United States Constitution. Ongoing incursions across our national borders and our nation’s applications of force abroad ensure that other lawsuits will be pursued. We . should discourage this litigation before it takes root.
Because it is clear that United States constitutional rights do not extend to aliens who (a) lack any connection to. the United States and (b) are injured on foreign soil, I would also resolve this appeal on the first prong of qualified immunity analysis. See id. at 236, 129 S.Ct. at 818 (“In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.”).[1]
*122 Whether a constitutional violation occurred here is a straightforward inquiry with a definite answer. First, if the plaintiffs have a constitutional claim at all, it arises under the Fourth Amendment, not the Fifth. See Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870-71, 104 L.Ed.2d 443 (1989). This en banc court re-confirms, however, that the Fourth Amendment protects only aliens with “significant voluntary connection[s]” to this country. United States v. Verdugo-Urquidez, 494 U.S. 259, 271, 110 S.Ct. 1056, 1064, 108 L.Ed.2d 222 (1990). Because Hernandez had no such prior connections, the Fourth Amendment claim fails.
Additionally, substantive due process under the Fifth Amendment does not offer a fallback claim here, not least because of the expressly limited reach of the Supreme Court’s decision in Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). Judge DeMoss’s dissent from the panel opinion aptly expressed incredulity about extraterritorial application of the Fifth Amendment:
If the fact that the United States exerts and has exerted powerful influence over northern Mexico, justifies application of the Fifth Amendment in a strip along the border, how wide is that strip? Is the Fifth Amendment applicable in all of Ciudad Juarez or even the entire state of Chihuahua? Ultimately, the majority’s approach devolves into a line drawing game which is entirely unnecessary because there is a border between the United States and Mexico.
Hernandez v. United States, 757 F.3d 249, 281 (5th Cir.2014) (DeMoss, J., concurring itl part and dissenting in part) (internal quotation marks and citation omitted).
I also feel obliged to comment on the plaintiffs’ Alien Tort Statute (“ATS”) claim against the United States, which has been rejected by the panel, by the' unanimous compromise en banc opinion, and indeed by every other circuit court of appeals.[2] A concurring opinion here arguably supports the assertion of nebulous claims for violations of “jus cogens ” and blithely suggests that the United States’ sovereign immunity may be ineffective in American courts against such claims. Among the many troubling implications of the separate opinion, it turns on its head the Supreme Court’s obvious reluctance to expand federal judges’ authority to import customary international law theories into domestic tort law without careful articulation and severe limitations or Congressional action. See Sosa v. Alvarez-Machain, 542 U.S. 692, 732, 124 S.Ct. 2739, 2765-66, 159 L.Ed.2d 718 (2004) (plaintiffs claim for “arbitrary arrest and detention” failed to state a violation of the law of nations with requisite “definite content and acceptance among civilized nations”); Kiobel v. Royal Dutch Petroleum Co., ■ — • U.S. -, 133 S.Ct. 1659, 1669, 185 L.Ed.2d 671 (2013) (presumption against extraterritoriality applies to Alien Tort Statute).
I. The Fourth Amendment, not the Fifth, Controls
The plaintiffs characterized their claims as arising under either the Fifth or the Fourth Amendment. But on these facts, they can only have a Fourth Amendment *123 claim. Constitutional rights are not interchangeable. When a litigant asserts multiple constitutional claims arising from the same conduct, we must “identify! ] the specific constitutional right allegedly infringed .... ” Graham, 490 U.S. at 394, 109 S.Ct. at 1870. If it becomes apparent that “a particular Amendment ‘provides an explicit textual source of constitutional protection’ against a particular sort of government behavior, ‘that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.’ ” Albright v. Oliver, 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (quoting Graham, 490 U.S. at 395, 109 S.Ct. at 1871) (internal quotation marks and footnote omitted). In essence, the specific trumps the general. This is especially true when a plaintiff brings both Fourth and Fifth Amendment claims asserting law enforcement misconduct. The Court has emphatically stated that “all claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other ‘seizure’ of a free citizen should be analyzed under the Fourth Amendment and its ‘reasonableness’ standard, rather than under a ‘substantive due process’ approach.” Graham, 490 U.S. at 395, 109 S.Ct. at 1871 (emphasis in original). Accordingly, substantive due process analysis is appropriate only if the plaintiffs’ claim is not “covered by” the Fourth Amendment. Cnty. of Sacramento v. Lewis, 523 U.S. 833, 843, 118 S.Ct. 1708, 1715, 140 L.Ed.2d 1043 (1998) (applying substanfive due process where the passenger of a motorcyclist being pursued by police was killed).[3]
Agent Mesa undoubtedly seized Hernandez. A seizure occurs “when there is a governmental termination of freedom of movement through means intentionally applied.” Brower v. Cnty. of Inyo, 489 U.S. 593, 596-97, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (emphasis omitted). Law enforcement shootings are also covered by the Fourth Amendment because “there can be no question that apprehension by the use of deadly force is a seizure!.]” Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). The plaintiffs’ complaint alleges that Agent Mesa intentionally shot and killed Hernandez, thus terminating his “freedom of movement through means intentionally applied.” Brower, 489 U.S. at 596-97, 109 S.Ct. at 1381. Under governing law, if the plaintiffs have any claim at all, it arises from the Fourth, not the Fifth Amendment.
II. The Non-Extraterritoriality of the Fourth Amendment
Although the Fourth Amendment “covers” the plaintiffs’ claim, Hernandez did not automatically enjoy its protection. The Constitution does not protect all people in all places. Reid v. Covert, 354 U.S. 1, 74, 77 S.Ct. 1222, 1260, 1 L.Ed.2d 1148 (1957) (Harlan, J., concurring) (“[T]here are provisions in the Constitution which do not necessarily apply in all circumstances *124 in every foreign place.”). This en banc court recognizes that the Supreme Court has foreclosed extraterritorial application of the Fourth Amendment to aliens where the violation occurs on foreign soil and the alien plaintiff lacks any prior' substantial connection to the United States. Verdugo-Urquidez, 494 U.S. at 261, 110 S.Ct. at 1059.
Chief Justice Rehnquist wrote in Verdugo-Urquidez that the Fourth Amendment’s text refers to the right of “the people” to be free' from unreasonable searches. “The people,” in turn, “refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.” Verdugo-Urquidez, 494 U.S. at 265, 110 S.Ct. at 1061. Turning to the Amendment’s history, the Court explained that “[t]he driving force behind the adoption of the Amendment ... was widespread hostility among the former colonists to the issuance of writs of assistance[.]” Id. at 266, 110 S.Ct. at 1061. The Amendment’s purpose, “was to protect the people of the United States against arbitrary action by their own Government[.]” Id. In other words, the Fourth Amendment “restrict[s] searches and seizures which might be conducted by the United States in domestic matters.” Id. Contemporary historical understanding, the Court continued, confirmed this reading. Id. at 267, 110 S.Ct. at 1061-62. As a result, the Court held, “aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.” Id. at 271, 110 S.Ct. at 1064.
Despite this seemingly clear pronouncement, critics, including the plaintiffs, claim that the substantial connections test is not — and never was — the law. Because Justice Kennedy concurred and his opinion allegedly differs from the purported majority, the skeptics argue, only four justices concurred in Chief Justice Rehnquist’s opinion and it is nonbinding. Even if that were not the case, the skeptics continue, Verdugo-Urquidez’s substantial connections test was replaced by the majority opinion in Boumediene. This court disagrees.
Foremost, Justice Kennedy joined the majority in full, not just in judgment. Supreme Court justices know the difference between the types of joinder. Justice Kennedy began his concurrence by stating: “Although some explanation of my views is appropriate given the difficulties of this case, I do not believe they depart in fundamental respects from the opinion of the Court, which I join.” Verdugo-Urquidez, 494 U.S. at 275, 110 S.Ct. at 1066 (Kennedy, J., concurring) (emphasis added). If we take Justice Kennedy at his word — as we must — -he undoubtedly joined the majority opinion, and the substantial connections test controls.
In any event, the substance of his concurrence does not undermine the substantial connections test — his opinion reinforces it. Concededly, Justice Kennedy did not rely on the Fourth Amendment’s reference to “the people”; in his view, “[t]he force of the Constitution is not confined because it was brought into being by certain persons who gave their immediate assent to its terms.”[4] Id. at 276,110 S.Ct. *125 at 1067. Instead, the Constitution’s application abroad “depend[s] ... on general principles of interpretation, not on an inquiry as to who formed the Constitution or a construction that some rights are mentioned as being those of ‘the people.’ ” Id., 110 S.Ct. at 1067. Applying such general interpretive principles, Justice Kennedy noted the Court’s historic reliance on the distinction between citizens and aliens in determining the Constitution’s reach. Id. at 275, 110 S.Ct. at 1066. “The distinction between citizens and aliens,” he explained, “follows from the undoubted proposition that the Constitution does not create, nor do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory.” Id., 110 S.Ct. at 1066. This traditional distinction, Justice Kennedy noted, runs through the Coúrt’s cases. Id., 110 S.Ct. at 1066.
For Justice Kennedy, the practical consequences of applying the Fourth Amendment extraterritorially also supports the Court’s test. “The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment ... should not apply [abroad].” Verdugo-Urquidez, 494 U.S. at 278,110 S.Ct. at 1068 (Kennedy, J., concurring). “For this reason, in addition to the other persuasive justifications stated by the Court,” Justice Kennedy “agree[d] that no violation of the Fourth Amendment [] occurred[.]” Id., 110 S.Ct. at 1068. Justice Kennedy’s concurrence reinforces rather than undermines Chief Justice Rehnquist’s majority opinion.[5]
III. The Non-Extraterritoriality of the Fifth Amendment[6]
After agreeing that Verdugo-Urquidez forecloses the plaintiffs’ Fourth Amend *126 ment claim, this court should have been quick to conclude that their alternate Fifth Amendment claim is equally thwarted by Johnson v. Eisentrager. 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). The Supreme Court held in Johnson, and has reiterated since then, that as a general matter aliens outside the sovereign territory of the United States are not entitled to Fifth Amendment rights. Id. at 782-85, 70 S.Ct. at 945-47. Verdugo-Urquidez described Johnson as unambiguously “rejecting] the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States.” Verdugo-Urquidez, 494 U.S. at 269, 110 S.Ct. at 1063. Johnson was similarly described by the Court in Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 2500, 150 L.Ed.2d 653 (2001); see also Castro v. Cabrera, 742 F.3d 595, 599 n. 5 (5th Cir.2014) (noting that Johnson “rejected] extraterritorial application of the Fifth Amendment”). This court is not at liberty to “underrule” Supreme Court decisions when the Court has explicitly failed to overrule its own precedents. Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989). Consequently, the plaintiffs’ substantive due process claim is barred by these precedents.
The plaintiffs’ implicit position is that Johnson was defacto overruled by Boumediene, 553 U.S. 723, 128 S.Ct. 2229, and Johnson’s refusal to apply the Fifth Amendment extraterritorially was replaced by the three-part test inaugurated in Boumediene.[7] As I have noted, this court squarely rejects the plaintiffs’ argument in regard to the Fourth Amendment. The diffidence with regard to the Fifth Amendment must stem from Boumediene ’s discussion and theoretical reframing of Johnson. See Boumediene, 553 U.S. at 766, 128 S.Ct. at 2259. Boumediene and Johnson admittedly share the factual similarity that enemy aliens incarcerated outside the continental United States were petitioning for habeas corpus review of their incarceration by the United States military. From the standpoint of this inferior court, however, reading tea leaves as to how far the Supreme Court plans ultimately to press extraterritorial application of constitutional provisions is a useless exercise. Until the Court overrules Johnson, we remain bound by its holding.
To be more précise, Boumediene was expressly limited to holding that the Suspension Clause, art. I, § 9, cl. 2 of the Constitution, applies to enemy combatants detained in the Guantanamo Bay, Cuba, military facility. Boumediene, 553 U.S. at 771, 128 S.Ct. at 2262. The significance of both the “Great Writ” and the United States’ plenary control at Guantanamo was equally critical to the Court’s holding. The Court stated: “In the system conceived by the Framers the writ had a centrality that must inform proper interpretation of the Suspension Clause,” and cited Blackstone, who called it the “bulwark of our liberties.” Id. at 739, 742, 128 S.Ct. at 2244, 2246 (citing 1 W. Blackstone, Commentaries *137). The Court also held that the concerns regarding separation of powers “have particular bearing upon the Suspension Clause question in the cases now before us, for the writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers.” *127 Id. at 765, 128 S.Ct. at 2259. With respect to the unique circumstances at Guantanamo, the Court variously stated that the Government has “total military and civil control”; “complete jurisdiction and control”; “de facto sovereignty”; and had “complete and uninterrupted control of the bay for over 100 years.” Id. at 747, 755, & 764, 128 S.Ct. at 2248, 2253, & 2258.
Boumediene fashioned a test that it claimed to derive from past decisions that considered the extraterritorial reach of other constitutional provisions. See Boumediene, 553 U.S. at 760, 128 S.Ct. at 2256 (citing In re Ross, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581 (1891) (Fifth and Sixth Amendments)); id. at 762, 128 S.Ct. at 2257 (citing Johnson, 339 U.S. 763, 70 S.Ct. 936 (Fifth Amendment)); id., 128 S.Ct. at 2257 (citing Verdugo-Urquidez, 494 U.S. at 277, 110 S.Ct. at 1067 (Fourth Amendment)). The Court concluded that de jure sovereignty does not alone determine the extraterritorial reach of the Constitution; instead, “questions of extraterritoriality turn on objective factors and practical concerns, not formalism.” Id. at 764, 128 S.Ct. at 2258. But the Court ultimately held its three-factor test relevant “in determining the reach of the Suspension Clause....” Id. at 766, 128 S.Ct. at 2259 (emphasis added). Moreover, the Court disclaimed any intention to overrule the holdings of Johnson or Verdugo-Urquidez. Id. at 795, 128 S.Ct. at 2275.
Given that Boumediene applied its three-factor test to a different constitutional provision than those with which we are confronted, and that it did not overrule the controlling precedents, it bears repeating: this court may not step ahead of the Supreme Court to hold Johnson (or Verdugo-Urquidez) no longer binding. Thus, this is not a case where no “clearly established law” articulates the plaintiffs’ rights to extraterritorial application of the Fifth Amendment. Following Boumediene, there is no law at all supporting their position, and thus no Fifth Amendment claim exists.[8]
Significantly, the plaintiffs cited no case holding that their Fifth Amendment extraterritoriality claim has any viability. To the contrary, in light of the Court’s repeated references to the Suspension Clause, we must assume that the Court “explicitly confined its holding ‘only’ to the extraterritorial reach of the Suspension Clause and disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause.” Ali v. Rumsfeld, 649 F.3d 762, 771 (D.C.Cir.2011) (internal citations and quotation marks omitted); see also Al Bahlul v. United States, 767 F.3d 1, 33 (D.C.Cir. 2014) (en banc) (Henderson, J., concurring) (“Whether Boumediene in fact portends a sea change in the extraterritorial application of the Constitution writ large, we are bound to take the Supreme Court at its word when it limits its holding to the Suspension Clause.” (internal citation omitted))[9]; Igartúa v. United States, 626 *128 F.3d 592, 600 (1st Cir.2010) (“[T]he Boumediene court was concerned only with the Suspension Clause ... not with ... any other constitutional text.”).
For all these reasons, the plaintiffs plainly have no cognizable constitutional claim against Agent Mesa.
IV. The Alien Tort Statute Does not Waive U.S. Sovereign Immunity
The plaintiffs seek damages from the United States under the ATS, urging as follows: Congress enacted the ATS to allow aliens to sue for violating “the law of nations.” 28 U.S.C. § 1350. The tort alleged in this case is “extrajudicial killing,” an alleged violation of jus cogens norms of customary international law.[10] Customary international law asserts that by their nature, jus cogens violations apply even without a nation’s consent (consent being the ordinary prerequisite to rules of customary international law).[11] In cases involving foreign officials sued for jus cogens violations of human rights, courts have held that individual immunity from suit does not exist. Finally, although the ATS has been held not to waive foreign states’ sovereign immunity, Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989), the plaintiffs assert that “Congress has not enacted a similar comprehensive scheme regulating U.S. sovereign immunity for international law violations prosecuted in our own courts.” And by this inaction, Congress has signaled that the United States is amenable to ATS suits.
The concurring opinion here finds this reasoning “logical,” concludes that it has some force,” and posits:
[I]f there is a category of torts (violations of the law of nations, for example) that change the ordinary rules of sovereign immunity because these acts cannot be authorized by the sovereign, then a country either would lack any such immunity to waive or would not be permitted to substitute for one of its officers.
Post at 142, 142-43, & 141 (Haynes, J., concurring). The concurrence asserts that this question has not been addressed by the panel opinion or the en banc compromise opinion that reinstates the panel decision. The concurrence believes this issue was left “unaddressed” in Sosa and suggests the Supreme Court take it up. Post at 141,142-43.
With due respect, the plaintiffs’ theory has yet to be adopted by any circuit court of appeals and has been repeatedly rejected, and that is because it has no valid foundation in the American constitutional structure, in the ATS, or in Supreme Court precedent. To effectuate their theory would create a breathtaking expansion of federal court authority, would abrogate *129 federal sovereign immunity contrary to clearly established law, and would have severely adverse consequences for the conduct of American foreign affairs.
Taking the Supreme Court decisions first, Sosa did not consider U.S. sovereign immunity for ATS violations because the federal government was sued only under the Federal Tort Claims Act. ,542 U.S. at 698,124 S.Ct. at 2747. The ATS claim was alleged only against Sosa, a Mexican national, individually. Id. at 698, 124 S.Ct. at 2747. No issue of American sovereign immunity from ATS claims was presented for the Court to decide or even comment on. The overarching theme of Sosa, moreover, is one of caution, not expansion of federal court authority. Inferences that Sosa might leave open an implied waiver of sovereign immunity are implausible. First, the Court in Sosa held unanimously that the ATS is a strictly jurisdictional statute. Sosa, 542 U.S. at 714,124 S.Ct. at 2755. It does not provide a substantive basis for aliens’ general assertions of customary international law violations. Purely jurisdictional statutes do not waive sovereign immunity. United States v. Testan, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Second, Sosa rejected the view that the ATS “ought to cover all [customary international law] claims, so long as they also qualify as torts” and instead gave “domestic legal force to an extremely limited subset of [customary international law] claims ... based on its reading of the specific intent of Congress.” Al-Bihani v. Obama, 619 F.3d 1, 19 (D.C.Cir.2010) (Kavanaugh, J., concurring in denial of rehearing en banc) (quoting Ernest A. Young, Sosa and the Retail Incorporation of International Law, 120 Harv. L.Rev. F. 28, 29 (2007)). According to Sosa, the only claims authorized by the ATS for violations of international law norms are those with no “less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.” 542 U.S. at 732, 124 S.Ct. at 2765. In addition, “the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, invariably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts.” 542 U.S. at 732-33, 124 S.Ct. at 2766 (footnotes omitted). The Court went on to deny Alvarez’s claim for arbitrary arrest and detention in violation of an international treaty and the Universal Declaration of Human Rights. 542 U.S. at 738, 124 S.Ct. at 2769.
What does this cautionary opinion imply about federal sovereign immunity? As earlier noted, the Court decided in Amerada Hess that the FSIA “provides the sole basis for obtaining jurisdiction over a foreign state in federal court,” 488 U.S. at 439, 109 S.Ct. at 690. The Court flatly rejected the argument that Congress, by failing explicitly to repeal the ATS when it amended the FSIA, had intended for federal courts to “continue to exercise jurisdiction over foreign states in suits alleging violations of international law outside the confines of the FSIA.” 488 U.S. at 435, 109 S.Ct. at 689. That rejection would have been even more emphatic had the court considered whether the ATS waives the United States’ sovereign immunity because, as then-Judge Scalia pointed out, foreign sovereign immunity rests only on international comity, while domestic sovereign immunity originates in the constitutional separation of powers. Sanchez-Espinoza v. Reagan, 770 F.2d 202, 207 n. 5 (D.C.Cir.1985). The plaintiffs here err twice in asserting the abrogation of federal sovereign immunity under the ATS.
First, my colleagues’ argument in the negative — that Congress silently reserved the defense of sovereign immunity against *130 potential violations of international law in U.S. courts, has it backward about the ATS, just as the Court held with respect to foreign sovereign immunity in Amerada Hess. Federal sovereign immunity is the overarching principle, which must be explicitly waived by the federal government.[12] “[T]he United States cannot be sued at all without the consent of Congress.” Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287, 103 S.Ct. 1811, 1819, 75 L.Ed.2d 840 (1983). To consent, Congress must unequivocally waive sovereign immunity in statutory text; waiver will not be implied. Lane v. Pena, 518 U.S. 187, 192, 116 S.Ct. 2092, 2096, 135 L.Ed.2d 486 (1996). As Judge Scalia held in Sanchez-Espinoza, “[i]t would make a mockery of the doctrine of sovereign immunity if federal courts were authorized to sanction or enjoin, by judgments nominally against present or former Executive officers, actions that are, concededly and as a jurisdictional necessity, official actions of the United States.” 770 F.2d at 207 (emphasis in original).[13]
Second, they mistakenly confuse cases deriving from foreign official immunity, an immunity based on officials’ status or conduct (and separate from the sovereign state’s own immunity), with the constitutional principle involved in U.S. sovereign immunity. See, e.g., Yousuf v. Samantar, 699 F.3d 763 (4th Cir.2012). No case has ever held the United States government has forfeited its sovereign immunity from suit because of any alleged violation of international law, whether jus cogens or otherwise. Nevertheless, they would expose the United States, alone among the nations of the world, to liability in federal courts under the ATS without the protection of sovereign immunity. Contrary to the plaintiffs’ assertions, the Supreme Court’s circumspect readings of the ATS in Sosa and Kiobel (rejecting ATS’s extraterritorial application) offer no basis for the novel proposition that the ATS impliedly forfeits federal sovereign immunity.
Neither the plaintiffs nor the concurring opinion mentions that every other circuit court asked to hold the United States potentially liable under the ATS has declined the invitation. For example, in Tobar v. United States, 639 F.3d 1191 (9th Cir. 2011), Ecuadorian nationals sued the Unitéd States under the ATS after the Coast Guard stopped, boarded, and detained their ship. The Ninth Circuit considered a number of statutes that might contain waivers of sovereign immunity, including the ATS. With respect to the ATS, the court held “[t]he Alien Tort Statute has been interpreted as a jurisdiction statute only — it has not been held to imply any waiver of sovereign immunity.” Id. at 1196 (internal citations and quotation marks omitted). This determination is particularly notable because it post-dates the Supreme Court’s decision in Sosa.
*131 The Fourth Circuit reached the same conclusion in Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 968 (4th Cir. 1992). The plaintiffs there asserted ATS claims against the United States government for property damage that occurred during the U.S. invasion of Panama. Once again, the government asserted its sovereign immunity, and the court agreed, holding that “any party asserting jurisdiction under the Alien Tort Statute must establish, independent of that statute, that the United States has consented to suit.” Id.
So too for the D.C. Circuit. In Sanchez-Espinoza v. Reagan, 770 F.2d 202 (D.C.Cir.1985), Nicaraguan citizens sued the United States for injuries incurred at the hands of the Contras. Id. at 205. The federal government asserted its sovereign immunity. Then-Judge Scalia held, in no uncertain terms, that “[t]he Alien Tort Statute itself is not a waiver of sovereign immunity.” Id. at 207; see also Canadian Transp. Co. v. United States, 663 F.2d 1081, 1092 (D.C.Cir.1980).
That these plaintiffs assert a violation of a jus cogens norm does not — and should not — change the outcome of the sovereign immunity analysis. The plaintiffs argue that jus cogens norms occupy such a high place in international law that their violation abrogates sovereign immunity. Other circuits to address such an argument have rejected it. In Matar v. Dichter, 563 F.3d 9, 14 (2d Cir.2009), the Second Circuit held that jus cogens norms cannot abrogate sovereign immunity when Congress has explicitly granted such immunity in the FSIA. It then broadly asserted that “[a] claim premised on the violation of jus co-gens does not withstand foreign sovereign immunity.” Id. at 15; see also Princz, 26 F.3d at 1174; Siderman, 965 F.2d at 718-719; Smith v. Socialist People’s Libyan Arab Jamahiriya, 101 F.3d 239, 242-44 (2d Cir.1996). The same principle should apply to the constitutionally-footed doctrine of federal sovereign immunity. Given the unanimous decisions of the other circuits, there is no justification for a federal court’s unilateral abrogation of our government’s sovereign immunity under the ATS.
Returning once more to Sosa, it becomes clear that the Court, as it rejected Alvarez’s broad claim for a violation of “the law of nations,” fully realized the potentially untoward consequences of empowering lower courts to adopt a federal common law of international law torts. Not only did the Court limit the scope of such actions, but it also explained the difficulties that would ensue had it adopted Alvarez’s facially appealing claim:
Alvarez cites little authority that a rule so broad has the status of a binding customary norm today. He certainly cites nothing to justify the federal courts in taking his broad rule as the predicate for a federal lawsuit, for its implications would be breathtaking. His rule would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by the law of the jurisdiction in which it took place, and would create a cause of action for any seizure of an alien in violation of the Fourth Amendment, supplanting the actions under Rev. Stat. § 1979, 42 U.S.C. § 1983, and Bivens ..., that now provide damages remedies for such violations. It would create an action in federal court for arrests by state officers who simply exceed their authority; and for the violation of any limit that the law of any country might place on the authority of its own officers to arrest. And all of this assumes that Alvarez could establish that Sosa was acting on behalf of a government when he made the arrest, for otherwise he would need a rule broader still.
*132 542 U.S. at 736-37, 124 S.Ct. at 2768 (footnote omitted).
Whatever’ may be said for the broad principle Alvarez advances, in the present, imperfect world, it expresses an aspiration that exceeds any binding customary rule having the specificity we require.
542 U.S. at 738,124 S,Ct. at 2769 (footnote omitted).
The parallels between these concerns and those attending a claim for “extrajudicial killing” are obvious. The plaintiffs’ advocacy here of a broad rule clearly has implications for both domestic law enforcement and for the use of American lethal force in.foreign confrontations. Such alleged violations of jus cogens could transform every use of deadly force by a federal officer against an alien into a litigable violation of a peremptory norm of international law, supplanting Bivens actions. These claims could also be asserted by aliens against state or local law enforcement officers, supplanting § 1983 actions. Finally, this alleged cause of action could be asserted directly against the United States, which contravenes federal sovereign immunity and is at odds with the FSIA immunity from suit every foreign nation enjoys in U.S. courts.
The existence of foreign sovereign immunity does not, however, eliminate the international complications of opening American courts to broad and vague claims under the ATS. As in Sosa, the plaintiffs’ proffered rule “would support a cause of action in federal court for any [alleged extrajudicial killing], anywhere in the world.” 542 U.S. at 736, 124 S.Ct. at 2768. Although certain jus cogens prohibitions, e.g. state-sponsored slavery or genocide, may be self-evidently within the scope of the Supreme Court’s reasoning in Sosa, “[a]ny credible invocation of a principle against [extrajudicial killing] that the civilized world accepts as binding customary international law requires a factual basis beyond” mere conclusional pleadings. Sosa, 542 U.S. at 737, 124 S.Ct. at 2769. That a multiplicity of claims could aggravate relations with foreign nations and thwart the Executive and Legislative branches’ discretion in conducting foreign affairs seems obvious and constitutes additional reasons, acknowledged in Sosa, for extreme caution in recognizing claims for breach of “the law of nations” actionable via the ATS. 542 U.S. at 727, 124 S.Ct. at 2763.
In sum, the plaintiffs’ ATS claim against the United States is without foundation, and the concurring opinion should not be read as improvidently providing them support.

Conclusion

A “Lawless” U.S. Border?
One final point is necessary in response to the plaintiffs’ assertion that enforcement of United States borders will become “lawless” if aliens in the position of Hernandez lose access to American civil tort recovery. This court must, of course, assume, based only on the pleadings, that Hernandez was the victim of an unprovoked shooting. The plaintiffs’ assertion of official, or officially condoned lawlessness is, however, inaccurate. This tragedy neither should, nor has, escaped review. Numerous federal agencies, including the FBI, the Department of Homeland Security’s Office of the Inspector General, the Justice Department’s Civil Rights Division, and the United States Attorney’s Office, investigated this incident and declined to indict Agent Mesa or grant extradition to Mexico under 18 U.S.C. § 3184. There were other possible avenues for evaluation of Agent Mesa’s conduct. Plaintiffs could have sought federal court review of the Attorney General’s scope of employment *133 certification under the Westfall Act. See Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 420, 115 S.Ct. 2227, 2229, 132 L.Ed.2d 375 (1995); see also Osborn v. Haley, 549 U.S. 225, 229-30, 127 S.Ct. 881, 887-88, 166 L.Ed.2d 819 (2007). Further, state systems may superintend excesses of federal executive authority. See 28 U.S.C. § 2679(d)(3). A judicially implied tort remedy under Bivens for constitutional violations or the Alien Tort Statute is not and was not the plaintiffs’ only source of review for this tragedy.
I respectfully concur in the en banc opinion.

. The en banc court did not consider whether, even if a constitutional claim had been stated, a tort remedy should be crafted under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Our en banc opinion neither assumes nor decides that question.

. See Princz v. Fed. Republic of Germany, 26 F.3d 1166, 1174 (D.C.Cir.1994) (rejecting the argument that jus cogens violations implicitly waive sovereign immunity under the Foreign Sovereign Immunities Act); Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 718-19 (9th Cir.1992) (same); Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 968-69 (4th Cir.1992) (rejecting plaintiffs' argument that the ATS waived the United States’ sovereign immunity); Sanchez-Espinoza v. Reagan, 770 F.2d 202, 207 (D.C.Cir.1985) (holding that "[t]he Alien Tort Statute itself is not a waiver of sovereign immunity”).

. The plaintiffs argue that Graham is inapplicable here because its rule only applies to “free citizens.” Graham does say all "seizure[s] of [ ] free citizen[s] should be analyzed under the Fourth Amendment....” 490 U.S. at 395, 109 S.Ct. at 1871. But the Court could not have intended to give non-citizens the ability to pursue claims under the more nebulous "substantive due process” standard, while limiting American citizens to the Fourth Amendment's reasonableness test. Nothing in Graham (other than the above quoted language) supports such an inference. Taken in context, Graham's reference to “free citizens” was intended to distinguish the scope of protection for "free citizens” from the rights accorded pretrial detainees (under the Fourteenth Amendment) and criminal convicts (under the Eighth Amendment). See Lewis, 523 U.S. at 843, 118 S.Ct. at 1715.

. This statement has led at least one court to refer to Justice Rehnquist's reasoning, specifically his reliance on the Fourth Amendment’s text, as only adopted by a plurality. See Lamont v. Woods, 948 E.2d 825, 835 (2d Cir. 1991) (explaining that "[t]o a plurality of the Court, the use of the phrase ‘the people’ suggested that the Framers of the Constitution intended the amendment to apply only to ■those persons who were part of or substan *125 tially connected to the national community”). But it does not throw Chief Justice Rehnquist’s holding,, that only aliens with a substantial connection to the United States have constitutional rights, into doubt. See Ibrahim v. Dep't of Homeland Sec., 669 F.3d 983, 996 (9th Cir.2012).

. Since the Court decided Verdugo-Urquidez, courts have applied the substantial connections test. See Ibrahim, 669 F.3d at 997 (applying the significant voluntary connection test to an alien’s First and Fifth Amendment claims); Kiyemba v. Obama, 555 F.3d 1022, 1026 (D.C.Cir.2009) (explaining that the "[D]ue [P]rocess [C]lause does not apply to aliens without property or presence in the sovereign territory of the United States”), vacated and remanded, 559 U.S. 131, 130 S.Ct. 1235, 175 L.Ed.2d 1070 (2010), reinstated in relevant part, 605 F.3d 1046 (D.C.Cir.2010); United States v. Emmanuel, 565 F.3d 1324, 1331 (11th Cir.2009) (holding that the Fourth Amendment does not protect a Bahamian citizen with no substantial connections to the U.S.); Atamirzayeva v. United States, 524 F.3d 1320, 1329 (Fed.Cir.2008) (holding that a foreign citizen with no substantial connections to the U.S. has no claim under the Fifth Amendment's Takings Clause); United States v. Barona, 56 F.3d 1087, 1093-94 (9th Cir. 1995) (explaining that "with regard to foreign searches involving aliens with 'no voluntary connection’ to the United States, [ ] the Fourth Amendment is simply inapplicable”).

. The plaintiffs argue without conviction that because Agent Mesa's conduct occurred solely on U.S. soil, this case does not require extraterritorial application of the Constitution. In both Verdugo-Urquidez and Sosa, however, the Supreme Court treated the cases as involving extraterritorial violations despite the presence of actions on American soil that preceded the foreign incidents. This case is no different. Indeed, the hoary principle of lex loci delicti ("law of the place of injury”) historically required the application of the law at the place where the last act causing injury (here, the bullet hitting Hernandez) occurred. Cf. Sosa, 542 U.S. at 708-711, 124 S.Ct. at 2752-2754 (interpreting the Federal Tort Claims Act foreign country exception, 28 U.S.C. § 2680(k), to apply where the injury occurred, not where the last act or omission causing injury occurred).

. That test requires courts to examine "(1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.” Boumediene, 553 U.S. at 766, 128 S.Ct. at 2259.

. I need not speculate on whether Boumediene 's rationale will ultimately be extended to determine the extraterritorial reach of other constitutional provisions. It is important to note, however, that even a defender of this prediction acknowledges the need for refinements of the three-factor functional test if Boumediene is brought to bear on other constitutional provisions. See Gerald L. Neuman, The Extraterritorial Constitution After Boumediene v. Bush, 82 S. Cal. L.Rev. 259, 287 (2009) ("This nonexclusive [three-factor test] was tailored to the Suspension Clause and its case law, and would presumably need modification to address other rights.").

. Al Bahlul's holding is not to the contrary. In Al Bahlul, the Government conceded that the Ex Post Facto Clause applies to aliens detained at Guantanamo Bay. 767 F.3d at 18. And the en banc court "assume[d] without *128 deciding that the Ex Post Facto Clause applies at Guantanamo.” Id. (italics in original).

. According to the Restatement (Third) of Foreign Relations Law § 702 and cmt. n (1987), a state violates a jus cogens norm if it as a matter of policy:
[PJractices, encourages, or condones (a) genocide, (b) slavery or slave trade, (c) the murder or causing the disappearance of individuals, (d) torture or other cruel, inhuman, or degrading treatment or punishment, (e) prolonged arbitrary detention, (f) systematic racial discrimination, [or] (g) a consistent pattern of gross violations of internationally recognized human rights.

. Vienna Conv. on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679 (jus cogens norm is "peremptory norm” of international law, "a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character”)'; see also Restatement (Third) of Foreign Relations Law § 102 and cmt. k (1987).

. This is exactly the point my colleagues fail to acknowledge. As they explain, because "Congress does not appear to have acted in the same way [as it did with the FSIA] to define federal court jurisdiction over suits against the United States by foreign nationals under the ATS,” the ATS, as interpreted in Sosa, can deny the government its immunity. Post at 140-41 n. 12. But the United States' immunity from suit in federal courts is the rule, subject to explicit exceptions. Therefore, Congress need not do anything to preserve its sovereign immunity.

. He qualified this statement by noting that, "These consequences are tolerated when the officer’s action is unauthorized because contrary to statutory or constitutional prescription, but we think that exception can have no application when the basis for jurisdiction [under the ATS] requires action authorized by the sovereign as opposed to private wrongdoing.” Id. (citation and footnote omitted).