# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 16-1902

———————————————

Shirley L. Phelps-Roper

*Plaintiff - Appellant*

v.

Pete Ricketts, In his Capacity as Governor of the State of Nebraska; Doug
Peterson, In his Capacity as Attorney General of the State of Nebraska; Todd
Schmaderer, In his Capacity as Chief of Police of the City of Omaha

*Defendants - Appellees*

Gary Troutman, in his capacity as City Administrator of Bellevue, Nebraska;
Leonard Houloose, in his capacity as Chief of the Papillion Police Department; L.
Kenneth Polikov, in his capacity as Sarpy County Attorney; John W. Stacey, in his
capacity as Chief of the Bellevue Police Department; City of Bellevue, Nebraska;
Gary Mixan, in his capacity as Mayor of the City of Bellevue; Kay Dammast, in
her capacity as City Clerk of Bellevue, Nebraska; Donald Kleine, in his capacity as
Douglas County Attorney; Joe Smith, in his capacity as Madison County Attorney;
William L. Mizner, in his capacity as Chief of the Norfolk Police Department;
Nathan Cox, in his capacity as Cass County Attorney; William Brueggemann, in
his capacity as Sheriff of Cass County, also known as Bill; Honorable Todd J.
Hutton, in his capacity as Sarpy County Judge; Nebraska Supreme Court;
John/Jane Does, in their official capacities

*Defendants*

——————

Appeal from United States District Court
for the District of Nebraska - Lincoln

——————

Submitted: June 8, 2017
Filed: August 11, 2017
_____

Before WOLLMAN, GRUENDER, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

This is another in a series of cases about the precise location of the line between the State's interest in protecting the privacy and peace of a vulnerable audience of mourners and the picketer's freedom to express herself under the Constitution.

Shirley Phelps-Roper and other Westboro Baptist Church (WBC) members consider military funerals to be "patriotic pep rallies" which suggest that God approves of national policies that WBC believes to be contrary to Biblical instruction. They therefore picketed such funerals in Nebraska to warn the nation and to assert their belief that God does not bless a nation that tolerates homosexuality and adultery. Nebraska's Funeral Picketing Law (NFPL) prohibits picketing within 500 feet of a cemetery, mortuary, or church from one hour prior through two hours following the commencement of a funeral. Neb. Rev. Stat. §§ 28-1320.01 to .03. Phelps-Roper brought this action against the State of Nebraska and the Omaha Police Department (OPD) challenging the constitutionality of the NFPL, facially and as applied. After a bench trial, the district court[1] upheld the NFPL and entered judgment for the appellees. Phelps-Roper appeals the district court's judgment. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

# I. Background

Twenty-six-year-old Caleb Nelson, a highly decorated Navy SEAL from Omaha, died in Afghanistan in October 2011 when his vehicle struck an improvised explosive device (IED). Days later, on a street corner in the soldier's hometown over 500 feet from his church funeral, a picketer in a t-shirt announcing "GOD HATES FAGS" held four colorful signs proclaiming in large font "THANK GOD FOR DEAD SOLDIERS," "SOLDIERS DIE 4 FAG MARRIAGE," "SHAME," and "DESTRUCTION IS IMMINENT." Another WBC picketer's signs added "NO PEACE FOR THE WICKED" and "GOD IS YOUR ENEMY," while the t-shirted picketer shouted "God is watching YOU" toward the passing cars to the blaring music of Bette Midler's "From a Distance."

Phelps-Roper, a longtime WBC member, has been participating in picketing for 25 years. She has attended "about half" of WBC's 46 funeral pickets in Nebraska. She and other WBC members picket funerals because they believe that patriotic displays during military funerals turn the funerals into "patriotic pep rallies" that erroneously suggest that God blesses and approves of national policies which WBC members consider contrary to Biblical teachings, including tolerance for homosexuality, adultery, and idolatry. The alleged "idolatry" includes "worshiping [the] dead body" of the soldier at each funeral they picket. Phelps-Roper believes that the funeral attendees do not really have a spirit of mourning or emotional distress; instead, she "perceive[s] a spirit of anger" and refers to funerals as "death events." WBC's target audience "is those people who are going into that funeral, those people who are presiding over that funeral, and all of the other people who are generally turning it into a patriotic hoopla." Their messages arguably generally focus on national issues.

WBC members plan their pickets in advance by contacting local law enforcement to inform them of their planned picket and to discuss locations. WBC

seeks locations with high traffic volume, where the mourners can see and hear its message, and from which the members can exit quickly if confronted with violence. WBC members claim to have participated in over 55,000 pickets, with violence only occasionally resulting. Their pickets begin 45 minutes before the announced time of the funeral and end when the funeral starts. They notify law enforcement in advance of their picketing plans, follow law enforcement guidance regarding picketing location, do not approach family members or funeral goers, do not go on private property, do not engage in civil disobedience, and do not block ingress/egress. WBC has numerous lawyer members including at least three who testified and another who represented Phelps-Roper during this trial.

The Patriot Guard Riders (PGR) is a national group of motorcyclists that "come together to show honor and respect for . . . military and first responder heroes." According to John Scott Knudsen, the Nebraska state PGR captain, there are around 3500 PGR members in Nebraska, and its members have attended over 500 events including military-related funerals, welcome-homes, and send-offs. The PGR does not engage in protests or protest activity, does not represent any particular political message or group, and has no target audience. When it comes to funerals, the PGR only attends events where it has been personally invited by close relatives of the decedent. At funerals, the PGR is not there to disrupt the funeral service; instead, its mission is to honor those who "paid the supreme sacrifice" and "shield the family from any distractions" by "simply form[ing] a flag line." It allows others who are not PGR members to join in its flag line as long as there are no signs or protest activities (including holding a flag upside down).

When the complaint in this lawsuit was filed on December 30, 2009, the NFPL was different from its current version. "The NFPL was originally enacted in 2006 to protect the 'legitimate and legally cognizable interest in organizing and attending funerals for deceased relatives' and 'the rights of families to peacefully and privately mourn the death of relatives.'" Phelps-Roper v. Troutman, 712 F.3d 412, 414 (8th

Cir. 2013) (quoting Neb. Rev. Stat. § 28-1320.01(1)). "The 2006 version of the statute defined picketing as 'protest activities . . . within *three hundred feet* of a cemetery, mortuary, church, or other place of worship during a funeral.'" Id. (emphasis added) (quoting Neb. Rev. Stat. § 28-1320.02(2) (2006)).

Phelps-Roper's initial motion for a preliminary injunction against the 2006 NFPL was denied, and she appealed in July 2010. While her appeal was pending, Nebraska Legislative Bill 284 expanded the buffer zone from 300 to 500 feet. Id. at 415. The amendment went into effect on August 27, 2011.

In October 2011, a panel of this court initially reversed the district court's order denying a preliminary injunction to Phelps-Roper. Phelps-Roper v. Troutman, 662 F.3d 485, 490 (8th Cir. 2011), vacated on reh'g, 705 F.3d 845 (8th Cir. 2012). Nebraska officials filed a petition for rehearing en banc on November 1, 2011. The rehearing petition was held in abeyance in December 2011, pending an en banc decision in a related case with similar First Amendment issues, Phelps-Roper v. City of Manchester, 697 F.3d 678 (8th Cir. 2012) (en banc). Phelps-Roper v. Troutman, 712 F.3d at 416. The city ordinance under consideration in City of Manchester prohibited picketing *within 300 feet* of any funeral or burial site from one hour before to one hour after a funeral or burial service. 697 F.3d at 683. In a unanimous en banc opinion published in October 2012, we concluded that the Manchester ordinance survived constitutional scrutiny because "it serve[d] a significant government interest, it [was] narrowly tailored, and it [left] open ample alternative channels for communication." Id. at 695.

In December 2012, we ordered a panel rehearing in the current case, vacated our earlier judgment, and ordered the parties to file supplemental briefs "addressing the merits of the appeal in light of City of Manchester, 'including the question of whether there are material differences between the ordinance at issue in City of Manchester and the Nebraska statute at issue in this appeal.'" Phelps-Roper v.

Troutman, 712 F.3d at 416. Nebraska argued there were "no constitutionally significant differences." Id. Phelps-Roper argued the buffer zone of 500 feet was unconstitutional (and different from City of Manchester) and also alleged that WBC was unconstitutionally targeted by the Nebraska legislature, citing a newspaper article in which a Nebraska legislator stated that he wished WBC protestors could be banned from picketing funerals. Id.

Because the NFPL's buffer zone changed from 300 feet to 500 feet while this case was on appeal, the district court had not had an opportunity to consider the larger buffer zone. We observed "[w]hen 'a change in law does not extinguish the controversy, the preferred procedure is for the court of appeals to remand the case to the district court for reconsideration of the case under the amended law.'" Id. (quoting Green Party of Tenn. v. Hargett, 700 F.3d 816, 824 (6th Cir. 2012)). Therefore, on April 12, 2013, we remanded this case to the district court "to consider Phelps-Roper's facial and as applied First Amendment challenges to the amended NFPL." Id. at 417.

WBC has picketed three funerals in Omaha since the NFPL was enacted—one on July 8, 2006 (July 2006 picket), one on August 28, 2010 (August 2010 picket), and the Nelson funeral on October 13, 2011 (October 2011 picket). Of those three, Phelps-Roper personally only participated in the October 2011 picket, which is also the only picket that involved application of the amended NFPL. During the October 2011 picket, WBC picketers stood at a location roughly 2000 feet from the funeral. Phelps-Roper asserts that the location was chosen by law enforcement, but law enforcement testified that they did not tell WBC where to stand and did not prohibit Phelps-Roper from picketing in a location of her choice. Both parties agree that in October 2011 WBC did not protest the location to law enforcement, and Phelps-Roper admits agreeing internally with other WBC members that the location was "good with us." WBC members testified that at all three pickets other people were near the funeral waving flags, holding signs, and chanting "USA, USA."

A bench trial was conducted in March 2015, and the parties subsequently submitted post-trial briefs and supplemental legal authority to the district court. On March 22, 2016, the district court entered judgment in favor of Nebraska finding that the NFPL survives First Amendment scrutiny in response to Phelps-Roper's facial and as-applied constitutional challenges. Phelps-Roper appeals the district court's judgment.

## II. Analysis

We review the district court's "factual findings for clear error and its legal conclusions de novo" after a bench trial. Outdoor Cent., Inc. v. GreatLodge.com, Inc., 688 F.3d 938, 941 (8th Cir. 2012) (internal quotation marks omitted). We will overturn a finding of fact under clear error review if the finding is: (1) not supported by substantial evidence; (2) based upon an erroneous view of the law; or (3) such that "we are left with the definite and firm conviction that an error has been made." Sawheny v. Pioneer Hi-Bred Int'l, Inc., 93 F.3d 1401, 1407-08 (8th Cir. 1996).

The First Amendment is a foundational pillar of our democracy and declares that States "shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble." U.S. Const. amend. I; see Gitlow v. New York, 268 U.S. 652, 666 (1925) (noting "freedom of speech . . . [is] among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States"); see also Benjamin Franklin, On Freedom of Speech and the Press, The Pa. Gazette, Nov. 1737, reprinted in The Works of Benjamin Franklin, Vol. II, 285 (Philadelphia, Hilliard, Gray & Co. 1840) ("Freedom of speech is a *principal pillar* of a free government; when this support is taken away, the constitution of a free society is dissolved, and tyranny is erected on its ruins." (emphasis added)). "We have recognized that the First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" Boos v. Barry, 485 U.S. 312, 318 (1988) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)).

Here, Phelps-Roper wishes to spread her message by picketing funerals. "[P]icketing plainly involves expressive conduct within the protection of the First Amendment . . . ." Police Dep't of Chi. v. Mosley, 408 U.S. 92, 99 (1972). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Connick v. Myers, 461 U.S. 138, 145 (1983) (internal quotation marks omitted). So, WBC members can hold placards commenting on the "political and moral conduct of the United States and its citizens, the fate of the Nation, homosexuality in the military, and scandals involving the Catholic clergy." Snyder v. Phelps, 562 U.S. 443, 454 (2011). This is true because "above all else, the First Amendment means that government has no power to restrict expression because of its message [or] its ideas." Mosley, 408 U.S. at 95.

However, "the fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views whenever and however and wherever they please." Wood v. Moss, 134 S. Ct. 2056, 2066 (2014) (internal quotation marks omitted). "[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances." Chaplinsky v. New Hampshire, 315 U.S. 568, 571 (1942). "[E]ven in a public forum the [State] may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are *narrowly tailored* to serve a *significant governmental interest*, and that they leave open *ample alternative channels for communication* of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (emphasis added) (internal quotation marks omitted).

Here, Phelps-Roper asserts facial and as-applied challenges to the constitutionality of the NFPL. We address each challenge in turn.

### A. Phelps-Roper's Facial Challenge to the NFPL

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully . . . ." United States v. Salerno, 481 U.S. 739, 745 (1987). "To succeed challengers [must] establish that no set of circumstances exists under which [the Act] would be valid, or that the statute lacks any plainly legitimate sweep." City of Manchester, 697 F.3d at 685 (internal quotation marks omitted) (citing United States v. Stevens, 559 U.S. 460, 472 (2010)). "[A statute] may also be invalidated on a facial First Amendment challenge as overbroad if a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." Id. (second alteration in original) (internal quotation marks omitted).

"The constitutionality of [a statute] regulating the exercise of protected speech in a public forum depends in large part on whether it is content based or content neutral." Id. at 686. A statute is "content neutral so long as it is *justified* without reference to the content of the regulated speech." Ward, 491 U.S. at 791 (internal quotation marks omitted). "Content based regulations, such as those which impose special prohibitions on those speakers who express views on disfavored subjects, are presumptively invalid, are subject to the most exacting scrutiny, and must be narrowly tailored to serve a compelling government interest." City of Manchester, 697 F.3d at 686 (internal quotation marks omitted). In contrast, "[c]ontent neutral time, place, or manner regulations . . . must be narrowly tailored to serve a significant governmental interest and allow for ample alternative channels for communication." Id. (internal quotation marks omitted).

Here, we find that the NFPL is content neutral. First, the NFPL is similar to the ordinance that we found content neutral in City of Manchester because it "simply limits when and where picketing and other protest activities may occur in relation to a funeral or burial service without regard for the speaker's viewpoint." 697 F.3d at 688-89; see also Hill v. Colorado, 530 U.S. 703, 704 (2000) (noting as content neutral a "regulation of places where some speech may occur" (internal quotation marks

omitted)).  Second, similar to the Manchester ordinance, "the asserted purpose for the [statute], the protection of citizens from disruption . . . during a funeral or burial service . . . is unrelated to the content of the regulated speech." City of Manchester, 697 F.3d at 688-89 (internal quotation marks omitted).  Third, regardless of any evidence of the Nebraska legislature's motivation for passing the NFPL, "the plain meaning of the text controls, and the legislature's specific motivation for passing a law is not relevant, so long as the provision is neutral on its face." Id. at 688 (internal quotation marks omitted); see also Hill, 530 U.S. at 724-25 (finding a statute content neutral despite being enacted to stop harassment of people outside medical clinics by anti-abortion groups); Frisby v. Schultz, 487 U.S. 474, 482 (1988) (finding a statute enacted in response to anti-abortion protestors to be content neutral).

As noted above under Ward, content neutral statutes must be narrowly tailored to serve a significant governmental interest and allow for ample alternative channels for communication.  491 U.S. at 791.  In City of Manchester, this court sitting en banc upheld a Manchester city ordinance that placed time and place restrictions on picketing at funerals.  697 F.3d at 683.  The ordinance barred "[p]icketing and other protest activities . . . within 300 feet of any funeral or burial site during or within one hour before or one hour after the conducting of a funeral or burial service at that place." Id.  The term "other protest activities" was defined as "any action that is disruptive or undertaken to disrupt or disturb a funeral or burial service." Id.  The Manchester ordinance did not restrict picketing or protesting funeral processions. Id.  Fines and imprisonment were possible with violations. Id.

In comparison to the Manchester ordinance, the NFPL states:

Unlawful picketing of a funeral; terms, defined.
. . . [T]he following definitions apply:
(1) Funeral means the ceremonies and memorial services held in connection with the burial or cremation of the dead but *does not include funeral processions on public streets or highways*; and
(2) Picketing of a funeral means protest activities engaged in by a person

or persons located *within five hundred feet of a cemetery, mortuary, church, or other place of worship during a funeral.*

Unlawful picketing of a funeral; penalty.
(1) A person commits the offense of unlawful picketing of a funeral if he or she engages in picketing *from one hour prior to through two hours following the commencement of a funeral.*
(2) Unlawful picketing of a funeral is a Class III misdemeanor.

Neb. Rev. Stat. §§ 28-1320.02, 28-1320.03 (emphasis added). Thus, the time and place speech restrictions of the NFPL differ from those of the Manchester ordinance because the place restriction extends the distance between the picketers and the funeral from 300 to 500 feet and the time restriction is "from one hour prior to through two hours following the commencement of a funeral," instead of Manchester's "during or within one hour before or one hour after the conducting of a funeral." We found that Manchester's ordinance (1) served a significant government interest, (2) was narrowly tailored, and (3) allowed for ample alternative channels for communication. City of Manchester, 697 F.3d at 695.

In this facial challenge, we ask "if there exist[s] any set of plausible circumstances in which [the NFPL] may be constitutionally applied and whether the ordinance has a plainly legitimate sweep." Id. at 693. "The government may restrict disruptive and unwelcome speech to protect unwilling listeners when there are other important interests at stake." Id. at 686. "Where there are competing interests and values, courts must find an acceptable balance between the constitutionally protected rights of law-abiding speakers and the interests of unwilling listeners." Id. (internal quotation marks omitted).

The increase of the buffer zone to 500 feet and the change in time restrictions in the NFPL compared to the Manchester ordinance do not change the outcome of this inquiry. Similar to the Manchester ordinance, we find that the NFPL serves a

significant government interest, is narrowly tailored, and leaves open ample alternative channels for communication. Therefore, we hold that the NFPL survives the facial challenge, as explained below.

*1. Nebraska's Significant Government Interest in the NFPL*

"[F]unerals implicate the most basic and universal human expression of the respect a society shows for the deceased and for the surviving family members." Id. at 693 (internal quotation marks omitted) (citing Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 168 (2004)). We have "conclude[d] that mourners attending a funeral . . . share a privacy interest analogous to those which the Supreme Court has recognized for individuals in their homes . . . and for patients entering a medical facility." Id. (citing Frisby, 487 U.S. at 484-85; Hill, 530 U.S. at 717; Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 767-68 (1994)). Here, the NFPL expressly states that it was enacted:

> to protect the privacy of grieving families and to preserve the peaceful character of cemeteries, mortuaries, churches, and other places of worship during a funeral . . .

Neb. Rev. Stat. § 28-1320.01.

At the bench trial, Nebraska presented experts supporting its significant interests. First, Dr. Scott Bresler, an expert in forensic psychology, testified that many mourners he interviewed felt victimized by WBC's pickets—identifying one such victim as the grieving widow who said WBC's August 2010 picket of her husband's funeral "caused [her] so much pain" and that she "felt very hurt" when she saw WBC's picket. Bresler testified that vulnerable mourners can suffer significant emotional injury due to the picketers' presence, and the 500-foot buffer zone helps. Bresler also testified that the pickets may trigger anger and violence from mourners, such that the buffer zone provides added safety. Second, James Davidsaver, an expert

in crowd control and management, also testified that a 500-foot buffer zone between the picketers and the funeral provides necessary space to help ensure the safety of a large number of people within a city block. We conclude that Nebraska has shown a "significant government interest in protecting the peace and privacy of funeral attendees for a short time and in a limited space"—so that vulnerable friends and family can mourn and honor their deceased loved one in a respectful environment of peace and privacy free from unwanted public exploitation. City of Manchester, 697 F.3d at 693 (internal quotation marks omitted) (citing Favish, 541 U.S. at 168).

## 2. The NFPL is Narrowly Tailored

"Although a valid time, place, or manner regulation need not be the least restrictive or least intrusive means of serving the government's interest, it may not restrict substantially more speech than is necessary." Id. (internal quotation marks omitted) (citing Ward, 491 U.S. at 798-99).

First, the NFPL's time restriction is narrowly tailored. In City of Manchester, we upheld a time restriction of one hour before through one hour after the funeral. Id. at 694. Here, the NFPL has a time restriction that is more narrowly tailored than the one in City of Manchester because it only limits picketing "from one hour prior to through two hours *following the commencement* of a funeral." Neb. Rev. Stat. § 28-1320.03 (emphasis added). Thus, under the NFPL the maximum time restriction is three hours. Whereas in City of Manchester, the time restriction lasted until one hour after the funeral regardless of funeral duration. We noted that "Manchester's ordinance only restricts protests for a relatively short period, tailored to encompass a mourner's time of highest emotional vulnerability and no longer," and that "[p]rotesters are free to picket throughout the area for most of the day." City of Manchester, 697 F.3d at 694. The NFPL's time constraint is more narrowly tailored than the ordinance that we upheld in Manchester, so the NFPL's relatively brief time restriction is properly narrowly tailored.

-13-

Next, the NFPL's place restriction is narrowly tailored. In City of Manchester, we upheld as narrowly tailored a place restriction that barred picketing in an area within 300 feet of a funeral. Id. at 694-95. Importantly, we noted that the "buffer zone" in the Manchester ordinance targeted "events, not locations." Id. at 694. In addition, the Supreme Court upheld as narrowly tailored a 500-foot restriction outside foreign embassies to protect security interests, a 100-foot zone around medical facilities to protect patient privacy, and an area "before or about" a home to protect residential privacy. Boos, 485 U.S. at 329 (upholding the 500-foot restriction); Hill, 530 U.S. at 725-30 (upholding the 100-foot restriction); Frisby, 487 U.S. at 476 (upholding "before or about" a residence).

Nebraska's expert in crowd control and management, James Davidsaver, testified based on his practical training and experience that the 500-foot buffer zone should give an adequate safe zone in the event of violence because "closeness kills" in these emotionally charged situations, while also allowing for control of traffic issues—pointing out that 500 feet is "just a city block." In addition, the NFPL's 500-foot zone does not create permanent speech-free zones because it targets only significant events instead of places and does not create floating speech-free zones moving about the area because it does not include funeral processions. Further, Phelps-Roper presented no convincing evidence that increasing the distance from 300 to 500 feet denied her the opportunity to express her message or that 500 feet was substantially more distance than required. In fact, one WBC member, Stephen Drain, seemed to have no problem with the 500-foot rule stating that 300 versus 500 feet did not make a difference, "[a]s long as I'm not out of sight and sound of my target audience." Also, given that the NFPL places no limit on the noise level, use of amplification equipment, or size of the picketers' signs, evidence is lacking that a 500-foot buffer is significantly different from a 300-foot buffer for communication of Phelps-Roper's message.

Finally, the NFPL's manner restriction is narrowly tailored. In City of Manchester, we upheld a manner restriction that limited picketing and "protest

activities." 697 F.3d at 693. Likewise the NFPL applies only to picketing and "protest activities." Neb. Rev. Stat. § 28-1320.02 (stating "[p]icketing of a funeral means protest activities"). Like in City of Manchester, the NFPL does not restrict the manner of speech by limiting noise level, amplification, placard or font size, or number of placards/protesters. The WBC member mentioned on the Omaha street corner in Part I of this opinion demonstrated many forms of protest during the October 2011 picket including (1) loud singing and music protests, (2) large sign protests, (3) colorful clothing protests, and (4) marching or movements protests—none of which are restricted by the NFPL.

Thus, the NFPL's time, place, and manner restrictions are narrowly tailored and do not restrict substantially more speech than necessary to achieve the state's significant interests.

*3. Ample Alternative Channels Exist for Communication of WBC's Message*

The NFPL leaves open many alternative channels for communication of WBC's message. First, during the narrow time and place restrictions delineated above, WBC members are free to lawfully picket and protest throughout the remainder of the city. Thus, in balancing the two competing interests, Nebraska left open large expanses of public property available for WBC's pickets and protests right up to the 500-foot line. "Speakers retain great latitude to express any viewpoint or discuss any topic at nearly any location and nearly any time" throughout the rest of the city of Omaha, except where funerals are actively occurring. City of Manchester, 697 F.3d at 695.

In addition, the WBC members (as pointed out in City of Manchester) are free to disseminate their message and publicize their views by (1) going door-to-door to proselytize, (2) distributing literature through the mail, (3) contacting residents by telephone, (4) writing letters to the editors of newspapers, and (5) using social media and the internet (WBC runs "eight or nine websites"). Id. Here, Professor Phyllis Larsen, an expert in communications, confirmed that these options are available to Phelps-Roper in Nebraska.

For the reasons stated above, we hold that the NFPL is not unconstitutional on its face.

### B. Phelps-Roper's As-Applied Challenge to the NFPL

"An as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court." Republican Party of Minn., Third Cong. Dist. v. Klobuchar, 381 F.3d 785, 790 (8th Cir. 2004). "If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." Id. Here, Phelps-Roper must show that the NFPL is unconstitutional "because of the way it was applied to the particular facts of [her] case." Salerno, 481 U.S. at 745 n.3. "[She] generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been . . . unconstitutionally *applied* to [her]. Specifically, when someone challenges a law as viewpoint discriminatory . . . , [she] must show that [she] was prevented from speaking while someone espousing another viewpoint was permitted to do so." McCullen v. Coakley, 134 S. Ct. 2518, 2534 n.4 (2014). The caveat that "First Amendment issues require a case-by-case analysis of the fact[s]" is especially true with regard to as-applied challenges. City of Manchester, 697 F.3d at 685 (alteration in original) (internal quotation marks omitted).

### 1. Scope of this As-Applied Review

Even though Phelps-Roper seeks review of three Omaha pickets, we look at this as-applied challenge only with regard to the October 2011 picket of Caleb Nelson's funeral because that is the only event before the court where the amended NFPL was applied in a situation involving the parties before the court—specifically, Shirley Phelps-Roper and the Omaha Police Department. Republican Party of Minn., 381 F.3d at 790 (noting that an "as-applied challenge consists of a challenge to the statute's application only as-applied to the part[ies] before the court").

It is undisputed that Phelps-Roper sought only prospective relief declaring the NFPL unconstitutional and seeking a permanent injunction against its enforcement in

her Third Amended Complaint. "When a law has been amended or repealed, actions seeking declaratory or injunctive relief for earlier versions are generally moot unless the problems are capable of repetition yet evad[ing] review." City of Manchester, 697 F.3d at 687 (alteration in original) (internal quotation marks omitted).

Here, a panel of this court remanded this case for "the district court to have the first opportunity to evaluate Phelps-Roper's facial and as applied challenges to the amended NFPL," and chose not to consider the earlier versions. Phelps-Roper v. Troutman, 712 F.3d at 416-17. The record does not support a reasonable expectation that Nebraska will reenact the earlier versions of the NFPL, and even if it did, there is no indication that it would evade review at the time that it is reenacted. Further, in City of Manchester, we upheld an ordinance similar to the earlier NFPL with a 300-foot buffer zone. 697 F.3d at 683. Therefore, we consider the issues as to the earlier versions moot and only consider the amended NFPL with the 500-foot buffer zone in this as-applied review.

## 2. Review of the District Court's Findings

The district court divided its as-applied analysis around three issues presented by Phelps-Roper: (1) Application of the NFPL by the OPD to persons other than Phelps-Roper, (2) Phelps-Roper allegedly being forced by the OPD well beyond the 500-foot radius, and (3) Permitting others to block Phelps-Roper's message. We will review each of the district court's factual findings for clear error and legal findings de novo for these categories in turn. Outdoor Cent., Inc., 688 F.3d at 941.

### a. Application of the NFPL to Persons Other than Phelps-Roper

To sustain an as-applied challenge based on viewpoint discrimination, Phelps-Roper must establish a "pattern of unlawful favoritism" by showing that she "was prevented from speaking while someone espousing another viewpoint was permitted to do so." Thomas v. Chi. Park Dist., 534 U.S. 316, 325 (2002); McCullen, 134 S. Ct. at 2534 n.4. We agree with the district court's findings and find no unlawful favoritism here.

*i. Phelps-Roper Was Permitted to Speak and Express Her Viewpoint*

Phelps-Roper and other WBC picketers picketed the funeral of Caleb Nelson on October 13, 2011 for about 45 minutes before the funeral. Phelps-Roper was obligated to abide by the NFPL since she was a funeral picketer or protestor. She was also obligated to follow other Nebraska laws. She stood on a street corner where the mourners had to pass to reach the funeral. She held four signs, sang loudly, played loud music, and moved around to draw attention to herself. The OPD helped her group identify a location that was (1) on public property, (2) legally outside the buffer zone, (3) on the main (possibly the only) route to the funeral, (4) near readily accessible parking, and (5) near a quick and easy exit route. After the event, a WBC attorney member sent the Omaha police chief a thank you note from the group mentioning the officers involved by name and commending them for being "dedicated to the proposition that 1st Amendment rights are precious." We agree that the OPD did not prevent Phelps-Roper from speaking at the October 2011 picket.

*ii. The OPD Did Not Unlawfully Favor Other Viewpoints Over Phelps-Roper's*

Phelps-Roper asserts that the OPD showed unlawful favoritism in applying Nebraska's laws to others at Caleb Nelson's funeral. Construing her argument liberally, Phelps-Roper refers to the Patriot Guard Riders, funeral attendees, and mourners—who the OPD did not prohibit from being within 500 feet of the church. But the record shows that Phelps-Roper and other WBC members were the only people at Caleb's funeral participating in "protest activities"[2] under the NFPL, and thus were the only relevant parties subject to the NFPL's restrictions. Neb. Rev. Stat. § 28-1320.02(2). Indeed, Phelps-Roper and other WBC members are self-described

---

[2]The NFPL defines picketing as "protest activities" within the buffer zone. Protest activities are not defined in the NFPL. "[T]here is no per se requirement that a statute must define these terms." Phelps-Roper v. Koster, 713 F.3d 942, 952 (8th Cir. 2013). "[I]n the absence of a statutory definition, [p]icketing can include a wide variety of activities . . . ." Id. (second alteration in original) (internal quotation marks omitted). The ordinance upheld in Frisby likewise did not define picketing. 487 U.S. at 477. "Courts will interpret statutes to avoid constitutional issues." Phelps-Roper v. Koster, 713 F.3d at 952.

protestors who targeted the "patriotic hoopla" associated with Caleb's funeral. By contrast, the PGR and other attendees were, as invitees, a part of the funeral itself, and thus they did not engage in "protest activities" within the meaning of the statute. See Favish, 541 U.S. at 168-69 (explaining the social and cultural significance of funerals). Therefore, the OPD had no obligation to move them beyond the 500-foot buffer zone. Moreover, the PGR members were invited by Caleb's family to attend his funeral, and Phelps-Roper offers no evidence that the PGR would not have accepted the invitation but for WBC's presence. In short, Phelps-Roper requests that this court create a rule that, because the WBC chooses to protest a funeral, all others already participating in or attending that funeral must likewise be considered "protestors" under the NFPL. We decline Phelps-Roper's request.

For the reasons stated above, we find no clear error with the district court's finding that "[t]here is no evidence to suggest that the NFPL was applied to Phelps-Roper and not others similarly situated."

b. *Phelps-Roper's Allegation that She Was Forced Well Beyond the NFPL's 500-Foot Radius*

Phelps-Roper alleges that the OPD unconstitutionally forced her to stand at a location 2000 feet from Caleb Nelson's funeral in October 2011 that was far beyond the 500-foot restriction required by the NFPL. We disagree.

First, the OPD cooperated with Phelps-Roper and other WBC members in trying to help them locate a safe and lawful location that met their goals. The evidence does not indicate that the OPD forced Phelps-Roper to stand at any particular location. Rather than sending an advance scout to pick a location, WBC's practice is to contact law enforcement in advance to seek assistance with finding a location for their picket. Attorney and WBC member Rebekah Phelps-Davis talked with OPD officers by phone on October 12, 2011—the day before the protest at Caleb Nelson's funeral. She used Google Maps to help her pick the location of her choice closest to Christ Community Church, the location of Caleb's funeral. WBC members' stated goals were for their picket location to be on an open space on public land that gave

them visibility to funeral attendees, "at a location where the words [were] going to be seen," and that has an easy and quick exit route if faced with danger. Phelps-Davis's handwritten notes from her planning conversations with the OPD indicated that she and Phelps-Roper considered the location "good with us" during their planning.

Phelps-Roper produced no written or other evidence that the OPD "required" WBC members to stand in any particular location. Phelps-Davis did not complain to the OPD about the location's distance from the funeral in her initial telephone call nor later after having time to review it with Phelps-Roper. The location chosen was around 2000 feet from the funeral. On cross-examination during her testimony while looking at a Google Maps exhibit of the area around the funeral site, Phelps-Davis acknowledged that the location was along the only road into the church and failed to offer a better location meeting WBC goals. We disagree that police officers' cooperating with WBC to help WBC find suitable, lawful locations prior to WBC events by phone or "suggesting" potential locations is the same as requiring WBC to occupy the location. Such a posture would stifle law enforcement's ability to facilitate WBC's free speech rights in advance in a way that helps prevent violence at their pickets. Law enforcement can cooperate and suggest locations without requiring WBC to occupy those locations. To rule otherwise would increase the danger associated with these activities. Phelps-Davis even agreed with the statement that her "handwritten notes indicate that the OPD cooperated with you in assisting you in having a protest." The NFPL was not unconstitutionally applied to Phelps-Roper during the advanced planning stage of the October 2011 picket.

Second, once at the funeral location, the OPD did not force Phelps-Roper to stand in the chosen location, and the OPD continued to cooperate with WBC fulfilling its duty to protect WBC members and the public from harm. WBC members testified that they carry devices to their pickets that they can roll on the ground to measure distances, including the 500 feet applicable in the NFPL. Phelps-Roper testified that once on site, she wanted to picket a closer area of a "big open sidewalk where the traffic that flows to the church would pass." However, she said, "Becky called me back after we had that discussion that this is *where we want to be . . . .*" (emphasis added). This implies that she walked toward the closer location and attempted to get

other WBC members to follow, but WBC picketers were already where they wanted to be.  More telling is the fact that police officers were on site at the time, and there is no evidence that any of them interfered with Phelps-Roper's walk toward the closer site from which she was "called back" or with her attempt to move the group to a closer location.

OPD Lieutenant Jay Leavitt, a 16-year veteran, testified that he met Phelps-Roper in a parking lot close to their chosen location and let them know that he would be nearby, showed them where the public right of way was located, and told them that he would protect their van in the parking lot so that nobody bothered it.  He testified that neither he nor any other OPD officer told WBC members where they could or could not stand, placed any markings on the pavement delineating where they could or could not stand, or in any other way tried to prevent WBC members from picketing in the location of their choice.

Third, the OPD has no affirmative obligation to scout and secure the optimum location for WBC pickets precisely 500 feet from the funeral.  Cf. Moss, 134 S. Ct. at 2068 ("No decision of which the Court is aware . . . would alert . . . agents engaged in crowd control that they bear a First Amendment obligation to ensure that groups with different viewpoints are at comparable locations at all times." (internal quotation marks omitted)).  We agree with Phelps-Roper's own testimony stating, "it is not the job of the Omaha Police Department to decide for us where is the best place for us to stand in an effort to reach our target audience."  OPD simply assisted WBC in identifying locations that were lawful by pointing out public rights of way and discussing the locations that might meet WBC's goals in a way that met OPD's goals of maintaining public order and safety in the City of Omaha.  Phelps-Roper was free to pick the lawful location of her choice.

Finally, Phelps-Roper and WBC never notified OPD of any concerns regarding their treatment at the October 2011 picket.  In fact, Jonathan Phelps, an attorney, wrote a thank you note on behalf of WBC thanking the OPD and praising Leavitt and another officer by name for their dedication to the First Amendment.

Thus, we find no clear error in the district court's conclusion "that the evidence has not shown that OPD [unconstitutionally] restricted Phelps-Roper's picketing to areas [well] beyond the 500-foot buffer zone."

### c. Permitting Others to Block WBC's Message

Phelps-Roper argues the NFPL was applied to her in an unconstitutional manner because others were allowed by the OPD to block WBC's messages and cites a recent Sixth Circuit case in support. See Bible Believers v. Wayne Cnty., 805 F.3d 228, 234 (6th Cir. 2015) (en banc) ("The scenario presented by this case, known as the 'heckler's veto' occurs when police silence a speaker to appease the crowd and stave off a potentially violent altercation."), cert. denied, 136 S. Ct. 2013 (2016). We disagree. There is no evidence that OPD silenced WBC or selectively allowed the crowd to act in an unlawful manner at WBC's October 2011 picket.

The decedent's family and other private parties are under no obligation to listen to WBC's message and can take whatever lawful means they wish to avoid hearing or seeing Phelps-Roper. The First Amendment guarantees free speech, not forced listeners. "The right of free speech is guaranteed every citizen that he may reach the minds of *willing* listeners and to do so there must be *opportunity* to win their attention." Kovacs v. Cooper, 336 U.S. 77, 87 (1949) (emphasis added). Mourners are "captive to their overwhelming human need to memorialize and grieve for their dead," and "[i]t is unreasonable to expect a family or friend of the deceased to reschedule or forgo attending the funeral so as to avoid offensive picketing." City of Manchester, 697 F.3d at 693. Having no other alternatives, mourners (and other Americans) are free under the Constitution to "avert their eyes," wear headphones, hire body guards (or instruct invitees) to block their view, pull shades, and otherwise use lawful measures to avoid exposure to Phelps-Roper's unwanted message—while exercising their right to pursue a peaceful, private, and tranquil funeral service to honor their loved one. See Erznoznik v. City of Jacksonville, 422 U.S. 205, 210-11 (1975) (noting that the viewer can "avoid further bombardment of [his] sensibilities

simply by averting [his] eyes." (alterations in original) (internal quotation marks omitted)). The OPD is not obligated to try to force others to listen to WBC's message—its obligation is to protect WBC's right to the *opportunity* to reach *willing* listeners.

In Bible Believers, the Sixth Circuit noted "the officers have a duty to protect speakers . . . from the reactions of hostile audiences." 805 F.3d at 236-37. "'A police officer has the duty not to ratify and effectuate a heckler's veto nor may he join a moiling mob intent on suppressing ideas. Instead, he must take reasonable action to *protect from violence* persons exercising their constitutional rights.'" Id. (emphasis added) (quoting Glasson v. City of Louisville, 518 F.2d 899, 906 (6th Cir.1975)). "If the officers allow a hostile audience to silence a speaker, the officers themselves effectively silence the speaker and effectuate a 'heckler's veto.'" Id. at 237.

The job of law enforcement is complicated by the fact that the crowd has the same First Amendment rights as WBC, which law enforcement also has a duty to protect. So, WBC is not entitled to its own bubble-ensconced pedestal surrounded by chalk lines or yellow tape any more than those opposed to WBC messages are entitled to a heckler's veto. Law enforcement has a duty to enforce the laws equally without regard to the viewpoints expressed. There is nothing in the record to suggest that the funeral attendees were engaged in speech inciting "imminent lawless action." Brandenburg, 395 U.S. at 447. In fact, Phelps-Roper admitted that there was no violence at the October 2011 picket. Likewise, Phelps-Roper presents no evidence that the OPD protected, facilitated, or ignored any other lawless action by the other speakers with differing viewpoints from WBC's. Instead, Officer Leavitt stayed nearby and guarded her group's van while keeping an eye on the protest. Afterwards, her group sent a thank you letter commending Leavitt and the OPD. Thus, this case is easily distinguishable from Bible Believers.

Therefore, we find no clear error in the district court's determination that the OPD did not unconstitutionally disfavor Phelps-Roper's viewpoint or allow others to

unlawfully block WBC's picket by preferentially allowing them to break Nebraska laws.

### III.  Conclusion

The rights of all speakers, including Phelps-Roper and others at funerals, to publically express their beliefs are protected by the First Amendment—but are not absolute and some time, place, and/or manner restrictions are allowed.  <u>Ward</u>, 491 U.S. at 791. Mourners, because of their vulnerable physical and emotional conditions, have a privacy right not to be intruded upon during their time of grief.  <u>City of Manchester</u>, 697 F.3d at 692.  We find that the NFPL strikes a balance between these competing interests of law-abiding speakers and unwilling listeners in a way that is not facially unconstitutional.  We likewise find that Phelps-Roper has failed to demonstrate that the NFPL was applied to her in an unconstitutional manner.

Affirmed.

_____